# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| AMALGAMATED TRANSIT UNION AFL-CIO-CLC; AMALGAMATED TRANSIT UNION LOCAL 1028 AFL-CIO-CLC; and AMALGAMATED TRANSIT UNION LOCAL 241 AFL-CIO-CLC, | ) ) ) ) ) ) ) ) | No. 05 C 6262<br><br>Paul E. Plunkett, Senior Judge |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS; and the ILLINOIS LABOR RELATIONS BOARD, STATE PANEL, and its PANEL MEMBERS JACKIE GALLAGHER, MICHAEL HADE, CHARLES HERNANDEZ, REX PIPER and LETITIA TAYLOR, as Rule 19 Defendants, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Last summer, the AFL-CIO, which had over the previous twenty-five years taken into its fold several previously independent unions, suddenly began to fragment. In late July, the International Brotherhood of Teamsters ("IBT") and the Service Employees International Union broke away from the AFL-CIO, taking approximately 3.2 million members with them. This lawsuit, filed in the wake of that divorce, has arisen because, contrary to a "no-raiding" agreement made between the AFL-CIO's Amalgamated Transit Union ("ATU") and the IBT signed several years before their merger,

-1-

the IBT is attempting to replace the ATU as the bargaining unit at two Pace facilities. The AFL-CIO's ATU has asked this Court to enjoin two elections scheduled by the Illinois Labor Relations Board ("ILRB"), one at the Pace "Northwest" facility for February 28, 2006, and the other at Pace's "Heritage" facility for February 24, 2006, at which time the employees of Pace could opt to join the IBT.[1] The IBT has moved to dismiss this action, claiming that this Court, under applicable federal labor statutes, lacks jurisdiction either to entertain the dispute or to order any injunctive remedy. For its part, the AFL-CIO's ATU has moved for a temporary restraining order and preliminary injunction to stop the elections. We deny all injunctive relief sought by the AFL-CIO for the reasons given hereafter. We dismiss the lawsuit as premature without prejudice to the filing of an amended complaint after the elections should the AFL-CIO lose either or both of these contests.

## Background

On August 31, 2005, the IBT, then a separate union and no longer subject to the AFL-CIO constitution and its corresponding provisions, filed a representation/certification petition ("RC Petition") with the ILRB state panel, seeking to replace the AFL-CIO's ATU local as the exclusive representative of virtually all of the Pace suburban public transportation employees at its Northwest Division. The collective bargaining agreement between Pace Northwest and the AFL-CIO (ATU Local 1028) expired on October 31, 2005, and those parties are currently negotiating a new

---

[1] While the amended complaint originally reflected election dates of January 27, 2006, for the Pace Heritage division and February 3, 2006, for the Pace Northwest division, the AFL-CIO's ATU advised this Court in a sur-reply of the date change. Without invitation, the two parties have literally showered this Court with memoranda, some coming as late as the day before the scheduled ruling. Both sides are reminded that briefs are only filed by leave of court.

-2-

agreement. Nevertheless, the ILRB, after refusing to consider the "no-raid" agreement tendered by the AFL-CIO, has scheduled an election for February 28, 2006.

Approximately one month after the IBT filed its first RC Petition, on October 6, 2005, the IBT filed a second RC Petition with the ILRB, this time for the Pace employees at the Heritage division. These employees were represented by the AFL-CIO (ATU Local 241) under a collective bargaining agreement that expired on December 31, 2005. The ILRB has scheduled an election for February 24, 2006, again ignoring the "no- raid" agreement.

The so-called "no-raid" agreement is the sole basis on which the AFL-CIO relies in asking that we enjoin the two elections scheduled by the ILRB. That agreement is somewhat problematic and might be thought of as an "emperor wearing no clothes." Consider its pertinent provisions:

> 1. Each union agrees to refrain from organizing or representing employees as to whom an established collective bargaining relationship exists involving the other union. For the purpose of this provision, the term "established collective bargaining relationship" means any situation in which either union (a) has been recognized by the employer as the collective bargaining representative involved, or (b) has been certified by the National Labor Relations Board or other federal, state or provincial agency as the collective bargaining agent of the employees.
>
> . . . .
>
> 3. If any dispute over the implementation of this Agreement shall arise at the local union level, the dispute shall be settled by the International Presidents of both unions or their designated representatives.
>
> 4. Either union may terminate this Agreement by giving the other Union six (6) months' notice in writing.

(Am. Compl. Ex. A.) The agreement is seemingly clear in what it prohibits. Yet, it is remarkably unclear in what to do about a violation of that prohibition. If one union feels raiding is taking place, its sole remedy is to submit the dispute to the two presidents who are asked to "settle" the question. The agreement does not spell out what to do if the presidents do not settle the dispute - exactly what happened here. In short, the agreement creates a right without a meaningful remedy. We will explore this problem in more detail later.

## **The Law**

As mentioned, the deceptively simple issue before us is whether this Court has jurisdiction to enforce the "no raid" agreement by use of our injunctive powers. If we do, arguably, we should enjoin the election at Pace, at least until a hearing in this Court. The resolution of the issue brings into play two seemingly conflicting statutes - Section 4 of the Norris LaGuardia Act ("NLA"), 29 U.S.C. § 104, and Section 301 of Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 - and two clearly conflicting policies underlying much of federal labor law. First, the statutes: the NLA, Section 4 provides:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such a dispute . . . from doing . . . any of the following acts:
>
> . . . .
>
> (b) Becoming or remaining a member of any labor organization or of any employer organization . . . .

29 U.S.C. § 104.[2]

As the IBT emphasizes in its motion to dismiss, the IBT and the AFL-CIO's ATU are clearly involved in a "labor dispute" as defined in 29 U.S.C. § 113(c).[3] *See, e.g., Blankenship v. Kurfman*, 96 F.2d 450, 453 (7th Cir. 1938); *Am. Fed. of State County and Mun. Employees v. United Domestic Workers*, No. 05CV1251BTM (POR), 2005 WL 2128979, at *5-6 (S.D. Cal. Aug. 9, 2005). It is also clear that the AFL-CIO action here seeks to prevent Pace employees "from becoming members of any labor union," *i.e.*, the IBT, though the AFL-CIO characterizes the case differently.[4] Thus, initially, it appears that the NLA's anti-injunction sections ban this Court from assuming jurisdiction over this dispute, at least insofar as invoking its injunctive power to enjoin an ILRB scheduled election.

But, not so fast – Section 301 of the LMRA must also be considered. After making clear in Section 301(b) that unions may sue and be sued in federal court, the LMRA provides in Section 301(a) that:

---

[2]While section 4 "contains a list of particular things that courts are not to enjoin" it "does not say that the prohibition of § 1 is *limited to* the sorts of activities mentioned in § 4." *AT&T Broadband, LLC v. Int'l Bhd. of Elec. Workers*, 317 F.3d 758, 760 (7th Cir. 2003) (emphasis in original). "It is designed, rather, to shout 'We really mean it!' for the activities at the core of union operations." *Id.* Compare 29 U.S.C. § 101 *with* 29 U.S.C. § 104.

[3]Section 113(b) of the NLA defines the term "labor dispute" as "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employ."

[4]Specifically, the AFL-CIO contends that "[a] private no-raiding agreement between labor unions, in which they voluntarily agree to refrain from representing certain employees, no more infringes on employees' rights to choose bargaining representatives than would an [*sic*] decision by a particular union, apart from such a non-raiding agreement, not to represent those employees or to disclaim interest in a bargaining unit." *See* Pls.' Mem. Supp. Mot. TRO at 9-10.

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Thus, Section 301 of the LMRA and Section 4 of NLA create the primary tension in this case. Section 301, which gives us jurisdiction to decide contract disputes between unions runs headlong into Section 4 of NLA, which forbids enforcing contracts through injunctions. *See Boys Mkts., Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 250 (1970) (acknowledging that "[t]he literal terms of [Section] 4 of the Norris-LaGuardia Act must be accommodated to the subsequently enacted provisions of [Section] 301(a) of the Labor Management Relations Act and the purposes of arbitration."). Perhaps the easy answer is that we can hear contract actions but not use our injunctive power to enforce them. But arguably the only meaningful remedy the AFL-CIO can obtain in this contractual dispute is an injunction. Once an election is lost, it is hard to understand how damages will be of much value to the AFL-CIO. Thankfully, this seeming enigma has been considered both by the Supreme Court and the Seventh Circuit, and each has provided some guidance in resolving the issue.

The Supreme Court has carved out a narrow exception to the anti-injunction provisions of the NLA for disputes involving collective bargaining agreements which are subject to a mandatory arbitration agreement. First addressing the issue in *Textile Works Union v. Lincoln Mills*, 353 U.S. 448 (1957), the Supreme Court held that, under section 301(a), agreements to arbitrate grievance disputes containing collective bargaining agreements should be specifically enforced. *Id.* at 455-58. In so holding, the *Lincoln Mills* court rejected the contention that the NLA's anti-injunction

proscriptions prohibited such relief, "noting that a refusal to arbitrate was not 'part and parcel of the abuses against which the [NLA] was aimed,' and that the [NLA] itself manifests a policy determination that arbitration should be encouraged." *Boys Mkts.*, 398 U.S. at 242 (quoting *Lincoln Mills*, 353 U.S. at 458) (internal citation omitted).

Thereafter, in *Boys Markets,* the Court concluded that the "core purpose of the [NLA was] not sacrificed by the *limited use* of equitable remedies" in order to further the "important" Congressional policy of favoring arbitration for peaceful labor dispute resolution. *Boys Mkts.*, 398 U.S. at 253 (emphasis added). Consequently, the NLA did not bar injunctive relief under the narrow circumstances presented, *i.e.,* where "a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure." *Id.* at 253. As the Court later acknowledged, "[t]he driving force behind Boys Markets was to implement the strong congressional preference for the private dispute settlement mechanisms agreed upon by the parties" and "[o]nly to that extent was it held necessary to accommodate [Section] 4 of the Norris-LaGuardia Act to [Section] 301 of the Labor Management Relations Act and to lift the former's ban against the issuance of injunctions in labor disputes." *Buffalo Forge Co. v. United Steel Workers*, 428 U.S. 397, 407 (1976).

Thus, the Supreme Court teaches that when the employer and union have provided in their collective bargaining agreement for a method to resolve disputes, the court can and should order the recalcitrant party to either proceed to the arbitration or comply with the mandate issued by the arbitrator. This exception to the anti-injunction provisions of NLA gives effect to the parties' contractual agreement to resolve their controversy through arbitration. Of course, these decisions enforced compulsory arbitration to resolve disputes under a collective bargaining agreement, and did not address the enforcement of a "no-raid" agreement. However, that issue was addressed in a pair

of cases from the Seventh Circuit, *United Textile Workers v. Textile Workers*, 288 F.2d 743 (7th Cir. 1958) and *NLRB v. Weyerhaeuser Co.*, 276 F.2d 865 (7th Cir. 1960).

In *United Textile Workers*, our circuit held that not only a collective bargaining agreement but a "no-raid" agreement between two unions, which specifically provided for mandatory arbitration, could be enforced by the federal court under Section 301 of LMRA, concluding:

> The defendant union is urging that despite its contractual commitment with plaintiff union, it is free to raid and capture members belonging to plaintiff because federal courts are without jurisdiction to compel obedience to non-raiding contracts. We disagree.

*United Textile Workers*, 258 F.2d at 749. However, the court did not address Section 4 of the NLA or how it applies to this scenario. Moreover, the plaintiff union in *United Textile Workers* merely attempted to enforce an arbitrator's decision which was made pursuant to the "no-raid" agreement signed by the parties. Thus, the plaintiff union invoked Section 301 of the LMRA to compel compliance with the defendant union's obligation under the agreement "to take action" once an arbitrator found a violation of that agreement.[5] *Id.* at 748. Although the Seventh Circuit decided *United Textile Workers* prior to the Supreme Court's guidance in *Boys Markets*, the decision appears to be in harmony with the *Boys Market* exception to the NLA's anti-injunction provisions in that the court issued the injunction in order to enforce the arbitrator's decision.

Less than two years later, the Seventh Circuit considered a variation of the problem in *Weyerhaeuser*. There, the court was confronted with an appeal by the National Labor Relations Board ("NLRB") seeking enforcement of an arbitrator's order to make an employer bargain with a

---

[5]Note, the present case is factually distinguishable from *United Textile Workers* as the present "no-raid" agreement does not contain comparable provision obligating the violating union "to take action." As noted above, the limits of the IBT/AFL-CIO "no-raid" agreement are left to the union presidents to "settle" the question. *See supra* at 3.

duly certified representative of a new union. *Weyerhaeuser*, 276 F.2d at 867. One of the issues was whether the NLRB erred in refusing to give controlling effect to a non-raiding agreement between the competing unions. *Id.* at 873. The court held that in light of its decision in *United Textile Workers, supra*, both a Section 301 proceeding between two unions in the district court and a Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e),[6] proceeding on appeal by the NLRB in the appellate court are appropriate channels for deciding representation questions.

The decision clarified to some extent the issue of enforcement of a "no- raid" agreement in the district court. The court cautioned, however, that there may be serious questions as to whether an alleged breach of a "no-raid" agreement can be the subject of a Section 301 proceeding. In the *Weyerhaeuser* dispute, the new union had chosen to disaffiliate from the AFL-CIO. The court concluded:

> We do not here give blanket approval to the Board's policy of refusing to recognize no-raiding agreements. The resolution of that broader problem calls into play the balancing of two beneficial, but conflicting, policy goals. The desire for stability in labor relations is in opposition to the right to freedom of choice in bargaining representation. There will also be the need for accommodating the statutory power of the courts to enforce contractual rights on the one hand with the jurisdiction vested in the Labor Board to determine questions as to representation on the other.

*Weyerhaeuser*, 276 F.2d at 875.

Thus, we conclude that the tension between these two policies must be decided on an *ad hoc* basis, not by a blanket refusal to use our equitable powers to enforce "no-raid" agreements. Let us consider the "no-raid" agreement before us. First, it was entered into twenty-seven years ago as a

---

[6]In its present form, section 10(e) of the National Labor Relations Act grants the NLRB the power to petition courts of appeals to enforce orders entered by the NLRB as to unfair labor practices. *See generally* 29 U.S.C. § 160(e).

prelude to the hoped-for merger of the AFL-CIO and the IBT. Secondly, it could be argued (as IBT does) that it was superceded by the merger agreement between the two unions and is now of no force or effect. Third, the AFL-CIO seeks to enforce the agreement after the dissolution of the merger and the IBT's "violation" did not occur until after the breakup. Finally, and most importantly, the "no-raid" agreement failed within its four corners to provide for arbitration or any meaningful method of resolving the dispute. It seems inappropriate to create an equitable remedy for a party which failed to provide any meaningful remedy for itself. In light of the guiding precedent, we hold that the "no-raid" agreement between two unions that does not provide for arbitration or any meaningful method of resolving a dispute under its provisions, which is "broken" after the relationship which led to its creation has ceased, cannot be used to enjoin a duly scheduled election by the ILRB. Ultimately, the AFL-CIO's inability to vindicate its rights does not sway this Court from its decision. *See AT&T Broadband*, 317 F.3d at 761 (recognizing that "[w]hat Congress established through the Norris-LaGuardia Act is that a substantive right does *not* imply an injunctive remedy" adding that an aggrieved party has to "settle for damages or other forms of *ex post* review, even if they turn out to be less effective at vindicating the underlying right.") (emphasis in original).

Our conclusion is consistent with the few district courts in other circuits that have considered the question. *See, e.g., Am. Fed'n of State County & Muni. Employees*, 2005 WL 2128979, at *5 (S.D. Cal. Aug. 9, 2005); *United Brick & Clay Workers v. Int'l Union of Dist. 50, Allied & Technical Workers*, 345 F. Supp. 495 (E.D. Mo. 1972). Significantly, in a decision on facts similar, if not identical to ours, the district court in Missouri, relying on Section 4 of the NLA, held that it had no jurisdiction to enforce a "no-raiding" agreement that, as here, did not contain an arbitration clause. *See United Brick & Clay Workers*, 345 F.Supp. at 497 (finding that the court was "without authority

to issue a permanent injunction" based in part on *Boys Markets*' affirmation of "the vitality of the Norris-LaGuardia Act when a contract does not involve a mandatory arbitration procedure" particularly where "no clear congressional policy has been pointed out which favors the enforcement of the type of contract involved in this case"). As noted by the IBT in its brief in opposition, these decisions "are in harmony with the public policy goals enunciated by Congress in the NLA." *See* Def.'s Reply Supp. Mot. to Dismiss. Indeed, Section 102 of the NLA provides "it is necessary that [the worker] have full freedom of association, self-organization and designation of representatives of his own choosing to negotiate the terms and conditions of his employment." 29 U.S.C. § 102. In our view, that policy may be even more important than the desire for peace among competing unions. *See, e.g., Weyerhaeuser,* 276 F.3d at 875 (concluding that resolution of whether to recognize no-raiding agreements "calls into play the balancing of . . .the desire for stability in labor relations" with the opposing "right to freedom of choice in bargaining representation").

Having decided to deny injunctive relief, we are left to consider whether to dismiss this case in its entirety. We have decided to do so, not because the AFL-CIO could not conceivably prove a breach (perhaps, for example, the no-raiding agreement survived the merger) nor because there could be no damages. Rather, we dismiss because the suit, now limited to seeking damage, is premature. The elections which AFL-CIO might lose have yet to occur. Should the plaintiff lose either or both, it may file an amended complaint within thirty days of the last to occur of the two Pace elections.

## Conclusion

For the reasons provided above, the Plaintiffs motion for injunctive relief is denied. Defendants motion to dismiss is granted although the dismissal, as noted above, is without prejudice.

**ENTERED:**

DATED: JAN 24 2006

UNITED STATES DISTRICT JUDGE